# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-KA-01441-SCT

*JOHN NORMAN COLE a/k/a BO COLE a/k/a*
*JOHN COLE*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 09/22/2016 |
| TRIAL JUDGE: | HON. MICHAEL M. TAYLOR |
| TRIAL COURT ATTORNEYS: | JASON E. TATE |
| | WILLIAM BRENDON ADAMS |
| | M. A. BASS JR. |
| COURT FROM WHICH APPEALED: | LINCOLN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: BENJAMIN ALLEN SUBER |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: SCOTT STUART |
| DISTRICT ATTORNEY: | DEE BATES |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/01/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE KITCHENS, P.J., MAXWELL AND ISHEE, JJ.**

**ISHEE, JUSTICE, FOR THE COURT:**

¶1. John Cole was adjudged guilty by a jury in the Lincoln County Circuit Court for the unlawful possession of less than thirty grams of marijuana with the intent to distribute, and the illegal possession of a firearm by a convicted felon. He was sentenced as a habitual offender. As a result, Cole was sentenced to serve three years for the marijuana-related charge, and ten years for the possession of the firearm; the sentences were ordered to run

consecutively. Cole filed posttrial motions, all of which were denied. This direct appeal followed, wherein Cole attacks the admission of certain evidence. Finding no error, we affirm.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶2. On August 6, 2015, Agent Hunter Huff of the Mississippi Bureau of Narcotics (MBN) received information from an anonymous tipster[1] that several unidentified individuals were outside a private residence selling drugs. The tipster conveyed to Huff that the house was located on, or around, Dr. Martin Luther King Jr. Drive, and had a chiminea (or fire pit) out front. In response, Huff, along with Captain Billy Ray Warner, Agent Jesse Leggett, and other officers arrived simultaneously at the location approximately described by the tipster to investigate the claim. They parked along the public roadway and found six men sitting near the street. Cole was one of the six, seated to the far right. The scene aligned roughly with that described by the tipster, according to Huff.

¶3. At that time, the agents immediately observed one of the individuals hide something under his shirt. Huff, Leggett, and the other agents then approached the men while Huff began explaining why they were present. When asked to produce the hidden object, the individual revealed a marijuana joint. The same individual had his foot on top of a CD case located on the ground, which was found to contain additional marijuana. A second

___

[1] The circuit court held that, although the anonymous tipster's identity was revealed during the suppression hearing, *and* that the tipster had in fact provided reliable information to officers in the past, the State was barred from subsequently using the anonymous tipster's known identity to bolster its position after having proceeded on a theory that the tip derived from an anonymous source.

individual produced from his pocket a bottle housing marijuana. The agents then found marijuana and a pistol on another individual, Lattrick Williams. Having found narcotics on at least three of the individuals present, as well as a gun, the agents continued the investigation and chose to frisk Cole for weapons. But when the agents either attempted, or initially began, to frisk Cole, he stood, then fled along the roadway.

¶4. Agents on the scene testified that Cole discarded what appeared to be a white hand towel while running. While pursuing Cole, Officer Barlow of the Brookhaven Police Department stated that he heard what sounded like metallic clinking along the pavement—when he looked down, he observed a revolver and alerted the other agents to its presence. When inspected by Leggett, the towel was found near a firearm. In close proximity to the pistol was marijuana. Cole subsequently was restrained by the agents, placed under arrest, and searched. Additional marijuana was found on his person. He was then taken to jail.

¶5. Once at jail, Cole was ***Mirandized***,[2] waived his rights, and spoke with Huff and Leggett. According to Huff's and Leggett's testimony, Cole provided a statement, in which he allegedly admitted selling the bags of marijuana for $10 each, and that he recently had purchased the pistol found at the scene for $120. Huff stated on cross-examination, however, that Cole's statement was not recorded in any fashion, and that no written report was constructed by either himself or Leggett detailing Cole's statement. But Huff also stated that, as a general practice, MBN does not record every statement of a suspect.

---

[2] *See **Miranda v. Arizona***, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

¶6. During pretrial proceedings, Cole moved to suppress evidence related to the marijuana and pistol, claiming that the search and seizure were unlawful and, therefore, those items were "fruit of the poisonous tree." Cole also sought to have any alleged statements by him suppressed.

¶7. During the suppression hearing, Cole chose to testify. Cole admitted that he had waived his *Miranda* rights and that he had "talked with" the agents, but he denied making any statements regarding the sale of marijuana. As a result, his testimony varied in some respects from that to which Huff and Leggett had testified. Even so, Cole admitted that he had fled because he did not want to go to jail, and that he was in possession of the marijuana and the pistol before he fled. Following the suppression hearing, the circuit court denied Cole's motion to suppress.[3]

¶8. As a result, Cole proceeded to trial on September 22, 2016. Upon conclusion of trial, the jury found Cole guilty of both counts charged, and he was sentenced as a habitual offender. As such, he received a three-year sentence for his possession of less than thirty grams of marijuana with the intent to distribute, and ten years for being a felon in possession of a firearm; the sentences were ordered to run consecutively, the entirety of which was to be served in the custody of the Mississippi Department of Corrections (MDOC).

¶9. Displeased, Cole moved for a judgment notwithstanding the verdict (JNOV) or, in the

---

[3] For reasons unknown, the circuit court never issued a written order denying Cole's motion to suppress—as a result, no such order is found in the record. The circuit court, however, acknowledged this omission during its *in camera* proceedings. The circuit court articulated on the record its denial of the motion, as well its rationale in reaching that conclusion.

4

alternative, a new trial—neither motion, however, specifically attacked the circuit court's admission of the firearm or marijuana. The circuit court ultimately denied all of Cole's posttrial motions. Aggrieved, Cole timely filed this direct appeal.

## STANDARD OF REVIEW

¶10. "This Court applies a mixed standard of review when considering Fourth-Amendment issues." *Cook v. State*, 159 So. 3d 534, 537 (Miss. 2015) (citing *Eaddy v. State*, 63 So. 3d 1209, 1213 (Miss. 2011)). "We apply de novo review when determining whether probable cause or reasonable suspicion exists." *Cook*, 159 So. 3d at 537. Our de novo review, however, is "limited to the trial court's 'decision based on historical facts reviewed under the substantial evidence and clearly erroneous standards.'" *Id.* (quoting *Dies v. State*, 926 So. 2d 910, 917 (Miss. 2006)).

## DISCUSSION

¶11. In seeking relief from this Court, Cole raises but one error: the circuit court's denial of his motion to suppress. Subsumed within this issue, however, is whether Cole's right to be free from unreasonable searches and seizures was violated.[4]

¶12. "Both the Fourth Amendment to the United States Constitution and Article III, Section 23 of the Mississippi Constitution protect an individual's right to be free from unreasonable searches and seizures." *Eaddy*, 63 So. 3d at 1212 (citing *Dies*, 926 So. 2d at 917-918); *see*

---

[4] We note that Cole attacks broadly the denial of his motion to suppress; however, conspicuously absent from Cole's brief to this Court is any argument as to the nonsuppression of his alleged statement to MBN agents. Because "this Court has long held that issues not raised on appeal are procedurally barred from consideration," we decline to address the merits of the circuit court's ruling as to whether Cole's alleged statement should have been suppressed. *Flynt v. State*, 183 So. 3d 1, 14 (Miss. 2015).

5

*also* U.S. Const. amend. IV; Miss. Const. art. 3, § 23. "To determine whether the search and seizure were unreasonable, the inquiry is two-fold: (1) whether the officer's action was justified at its inception, and (2) whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Gonzales v. State*, 963 So. 2d 1138, 1141 (Miss. 2007).

¶13.    "As a general rule, the state and federal constitutions prohibit warrantless searches unless an exception applies." *Eaddy*, 63 So. 3d at 1213. Therefore, "[u]nless the State proves that a warrantless search comes within an exception, all evidence seized from the search is inadmissible." *Id.* A noncustodial investigatory stop, commonly referred to as a *Terry* stop, is a recognized exception.[5] *See Gonzales*, 963 So. 2d at 1141.

### I.    Investigatory Stops

¶14.    Before this Court may address the merits of whether the circuit court erred in denying Cole's motion to suppress, we first must determine the lawfulness of the investigatory stop, as any evidence derived from an illegal search or seizure will be deemed tainted as "fruit of the poisonous tree." *United States v. Mayberry*, 193 F. Supp. 3d 724, 731 (S.D. Miss. 2016).

¶15.    With that in mind, it is well-settled that "[p]olice officers may detain a person for a brief, investigatory stop consistent with the Fourth Amendment when the officers have 'reasonable suspicion, grounded in specific and articulable facts[,]' [which] allows the officers to conclude the suspect is wanted in connection with criminal behavior." *Eaddy*, 63 So. 3d at 1213; *see also Terry*, 392 U.S. at 21.

---

[5] *See Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

6

### A. Reasonable Suspicion

¶16. Generally, there are two sources from which grounds for reasonable suspicion may be established: "either the officers' 'personal observation' or an informant's tip." ***Eaddy***, 63 So. 3d at 1213 (citing ***Florida v. J.L.***, 529 U.S. 266, 270, 120 S. Ct. 1375, 146 L. Ed. 2d 254 (2000)). "The officer's personal observation includes information from other law-enforcement personnel." ***Eaddy***, 63 So. 3d at 1213. "And an informant's tip may provide reasonable suspicion if accompanied by some indication of reliability; for example, reliability may be shown from the officer's independent investigation of the informant's information." ***Id.*** (citing ***J.L.***, 529 U.S. at 270).

¶17. That said, the scope of an investigatory stop is not unlimited. ***Eaddy***, 63 So. 3d at 1213. Rather, "[t]he scope of a search or seizure must relate to the initial circumstances that called for police action." ***Id.*** at 1214. And "[w]hen police detention exceeds the scope of the stop, the stop becomes a 'seizure,' and the State must show probable cause." ***Id.***

¶18. Applied here, Cole argues that the agents' actions were not justified at the inception of the stop because "they did not possess a reasonable belief that Cole was armed," and therefore, "lacked authority to conduct a ***Terry*** pat-down for weapons." Unclear, however, is whether Cole is arguing that the inception of the stop began with the agents' initial approach of the group, or when Huff attempted to frisk Cole's person. Regardless, to assess whether the agents' stop was justified at its inception—be it the overall group or of Cole himself—we must review which facts, including any rational inferences drawn therefrom, were known to the agents beforehand. ***Terry***, 392 U.S. at 21.

7

¶19. From the record, testimony reveals the following:

(1) Agent Huff received an anonymous tip regarding "narcotics activity in a certain location on or about, near Martin Luther King Street . . . [at] a certain house on the street, [perhaps] the third or fourth on the left;"

(2) The tip, as relayed by Huff to the other agents, conveyed "information about some subjects who were sitting outside of a residence, at or near a residence with a chiminea out front on Martin Luther King, [and that] said subjects would pull up in vehicles and purchase drugs from people at that residence;"

(3) MBN's "[s]tandard procedure" for tips implicating "a location that may have drug activity" is to "generally try to get multiple agents, at least three [to] four, [and] go to that residence" to investigate;

(4) The agents arrived at a location "where a chiminea was right next to it in a driveway," which had "individuals sitting outside[;]"

(5) The agents "parked on the shoulder of the road," and "could see several subjects there at the end of the driveway [of] the residence, maybe five or six sitting down." As the agents exited their vehicles, Warner observed the first individual "stuffing something under his shirt," which "raised suspicion[.]" The agents then "started to walk across the street" toward the individuals;

(6) Having already observed one of the individuals hide something under his shirt, the agents approached the individuals and informed the individuals that they had received a "complaint that there might be narcotics activity" at that location, and that they "were there to investigate it;" and

(7) Huff then began to question the individual who was observed stuffing something under his shirt about "why or what he was putting under his shirt."

Thus, up to the point that the agents arrived at the location and parked their vehicles, they were merely acting upon information provided through an anonymous tip.

¶20. Where an anonymous tip is involved, the "tipster's 'veracity,' 'reliability,' and 'basis of knowledge' are relevant considerations in establishing reasonable suspicion." *Cooper v. State*, 145 So. 3d 1164, 1168 (Miss. 2014) (citing *Alabama v. White*, 496 U.S. 325, 328–329,

8

110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990)).  The Supreme Court has held, however, that "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity[.]" *White*, 496 U.S. at 328–329.  But even so, "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'" *J.L.,* 529 U.S. at 270 (quoting *White*, 496 U.S. at 327).  Therefore, "[r]easonable suspicion is dependent upon the content of the information possessed by the detaining officer as well as its degree of reliability."  *Cooper*, 145 So. 3d at 1168.  And as this Court has reiterated, "[b]oth factors—quantity and quality—are considered in the 'totality of the circumstances.'"  *Id.* (citing *Williamson v. State*, 876 So. 2d 353, 355 (Miss. 2004)).

¶21.    As to the anonymous tipster in this case, the circuit court specifically found:

> [K]nowing the source of [the tip],[6] the agents had maybe a basis of a history, track record of reliability, [but] what the agents lacked at that point . . . was any demonstration that the tipster was in a position to know and had knowledge and—although it may have been a reliable person, it was a reliable person communicating second, third, fourth-hand hearsay . . . and it's not at all clear from the tip or from any of the subsequent testimony that the tipster was in a position to have firsthand or reliable knowledge of any of the things about which he communicated to the officer.

Therefore, reviewing this finding by the circuit court, in light of the previous holdings by the Supreme Court and this Court, we find the tip here, *alone*, did not possess sufficient "indicia of reliability" to provide the agents with reasonable suspicion to stop the group, or any of its

---

[6] *See supra,* n.1.

9

individual members.[7] *Cooper*, 145 So. 3d at 1168.

¶22. But in this case, the tip was *not* the sole basis for the agents' actions—here, the agents personally observed what they deemed "suspicious" behavior as soon as they arrived on the scene, thereby establishing an independent ground for reasonable suspicion. *See Eaddy*, 63 So. 3d at 1213. Therefore, based upon the agents' personal observation of suspicious activity (an individual within the group of interest hiding something under his shirt), as well as their corroboration of certain (albeit, vague) details provided in the tip (approximate location and existence of the group), we hold that, objectively speaking, the agents possessed specific, articulable facts constituting a reasonable suspicion that criminal activity was afoot. *See Terry*, 392 U.S. at 21.

¶23. As a result, then, we find that, at minimum, the agents were justified in their stop of at least the first individual observed acting suspiciously. *See id.* We acknowledge, however, that "[t]he Supreme Court has never viewed *Terry* as a general license to detain everyone within arm's reach of the individual whose conduct gives rise to reasonable suspicion," which here, would be the individual first observed stuffing something under his shirt. *United States v. Hill*, 752 F.3d 1029, 1037 (5th Cir. 2014) (quoting *United States v. Navedo*, 694

---

[7] *See, e.g.*, *McClellan v. State*, 34 So. 3d 548, 552 (Miss. 2010) (valid investigatory stop where officers further investigated "vague" information received from informant before making the stop); *Burchfield v. State*, 892 So. 2d 191, 194–95 (Miss. 2004) (reasonable suspicion for investigatory stop supported by store clerk's tip that described defendants who had purchased precursors and by officer's personal observation of defendants' purchases in vehicle described by clerk); *Williamson*, 876 So. 2d at 356 (reasonable suspicion for investigatory stop supported by tip from unnamed informant who described, in relevant part, the defendant and his vehicle and tag number, and by officer's subsequent verification of number). *Eaddy*, 63 So. 3d at 1213.

F.3d 463, 468 (3d Cir. 2012)). Therefore, we must review the remaining details of the stop in order to ascertain whether a "seizure" of Cole took place, thus implicating the Fourth Amendment.

### B. Seizure

¶24. Having established that the agents possessed reasonable suspicion to initiate a *Terry* stop, we must now determine if and when Cole was "seized" within the meaning of the Fourth Amendment.

¶25. "A seizure begins when 'all the circumstances surrounding the incident' are such that 'a reasonable person would have believed that he was not free to leave.'" *Hill*, 752 F.3d at 1033 (quoting *INS v. Delgado*, 466 U.S. 210, 215, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984)). And as the Supreme Court stated in *Terry*, "[o]nly when the officer[s], by means of physical force or show of authority, [have] in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry*, 392 U.S. at 19, n.16. But, because "[t]he constitutional requirements for an investigative stop are less stringent than those for a full arrest," "a person may be detained short of a full arrest for investigatory purposes." *Dies*, 926 So. 2d at 918. Therefore, "[Cole] must have been 'seized' or 'temporarily detained' by [the agents] before his flight . . . to trigger Fourth Amendment protection." *Cooper*, 145 So. 3d at 1171.

¶26. Here, the record reflects that, after observing the first individual stuffing something under his shirt, the agents approached the group, explaining the purpose for their presence. Huff then began to question the individual who was observed stuffing something under his

11

shirt about "why or what he was putting under his shirt." The individual revealed that he had concealed a marijuana joint. The same individual was concealing additional marijuana located on the ground. The discovery of marijuana on the first individual was treated by the agents as an initial verification of the information received in the tip (*i.e.*, possible distribution of narcotics). Warner testified that once they discovered contraband on the first individual, "everybody else [was] starting to get a little nervous," so they asked generally whether the remaining individuals were in possession of any narcotics.

¶27. In response, a second individual produced from his pocket a bottle housing marijuana, which the agents found to further verify the information they had received. The agents stated that, during this entire time, Cole remained seated, had not asked to leave, was not under arrest, and had not been placed in handcuffs. The agents then found marijuana and a pistol on the third individual, Williams. Having found narcotics on at least three of the individuals present, as well as a gun, the agents continued their investigation and determined that Cole needed to be frisked for weapons as well. Leggett and Warner stated that it was only *after* the gun was found on Williams that Cole was no longer free to leave—that is, he was temporarily detained.

¶28. In his brief, however, Cole asserts that "once the officers arrived on the scene and questioned the first individual, [he] was under arrest and not allowed to leave." We disagree that Cole was under arrest, as this Court, in *Jackson v. State*, 335 So. 2d 116, 118-19 (Miss. 1976), defined what constitutes an arrest:

> An arrest is not consummated until there has been a taking or possession of a person by manual caption, or submission on demand; and although a manual

12

> touching is unnecessary unless there is resistance to an arrest, there must be restraint of a person to establish an arrest.

*See also* ***California v. Hodari D.***, 499 U.S. 621, 626, 111 S. Ct. 147, 113 L. Ed. 2d 690 (1991) (holding that "[a]n arrest requires either physical force . . . or, where that is absent, submission to the assertion of authority."). Thus, in light of ***Jackson*** and ***Hodari***, we cannot conclude that Cole was under arrest, as Cole points to nothing in the record showing that when the agents arrived he was physically placed under arrest, or that he personally submitted to any show of authority. Instead, testimony from the agents reveals that Cole did nothing but remain sitting until it was determined that he needed to be frisked for weapons. And from his own testimony given at the suppression hearing, Cole stated that, prior to fleeing, he "hadn't made any attempt to leave," and that "[n]o one told [him he] was under arrest."

¶29.   Still, viewing "all of the circumstances surrounding the incident," we must determine whether a "reasonable person" in Cole's position would have felt free "to disregard the police and go about his business" prior to the agents' discovery of a weapon and their subsequent decision to frisk him. ***United States v. Mendenhall***, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980); ***Florida v. Bostick***, 501 U.S. 429, 434, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991). Under the facts of this case, we cannot find that a reasonable person would have felt such freedom.

¶30.   And so, though not placed under arrest at the moment the agents began questioning the first individual, we nonetheless agree with Cole that he was temporarily detained once that initial questioning began. Even so, we still hold that both the inception of the stop—and

13

its accompanying detention—were lawful under *Terry*. This is because the anonymous tip implicated a group of individuals possibly distributing narcotics. The agents, when approaching the group of interest, then personally observed an individual within the group of interest acting suspicious. When investigated further, the agents discovered marijuana on at least three individuals. Treating those discoveries as verification of the information received in the tip, and coupled with their independent observations, we hold that the agents were justified in their temporary detention of the remaining individuals comprising the group "for purposes of investigating possibl[e] criminal behavior[.]" *Terry*, 329 U.S. at 22.

¶31.    That said, we know that Cole definitively was detained after the discovery of the weapon because Warner articulated to the other agents, and in Cole's presence, that Cole then needed to be frisked for weapons. In light of what the agents had discovered up to that point in their investigation (narcotics *and* a firearm), we also find that the agents were justified in their decision to frisk Cole. This is because "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 329 U.S at 27. Based upon the facts of this case, we find that a reasonably prudent man would be justified in that belief.

¶32.    To that end, the Supreme Court in *Terry* further held:

> When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.

14

*Terry*, 392 U.S. at 24. Therefore, we hold that the agents were entitled "to conduct a carefully limited search of the outer clothing of [Cole] in an attempt to discover weapons which might be used to assault [the agents]." *Id.* at 30. And as the *Terry* Court stated, "[s]uch a search is a reasonable search under the Fourth Amendment[.]" *Id.* at 31. And so, this Court holds that the agents' investigatory stop was lawful under *Terry*, both at its inception, and in its scope. For purposes of thoroughness, however, we choose to further address the "scope" of the stop, as it implicates a subissue raised by Cole.

### C. Scope of Stop

¶33. As to the scope of the stop, Cole argues that, even if the agents possessed a reasonable suspicion justifying a brief investigatory stop, "their conduct was not reasonably related to the reason that justified the stop[.]" He reasons, then, that their conduct exceeded the permissible scope of the investigatory stop. As noted above, "[t]he scope of a search or seizure must relate to the initial circumstances that called for police action." *Eaddy*, 63 So. 3d at 1214. And "[w]hen police detention exceeds the scope of the stop, the stop becomes a 'seizure,' and the State must show probable cause." *Id.* On these facts, then, the initial circumstance calling for police action was an anonymous tip conveying possible narcotics activity, and the permissible scope of that detention was to investigate and determine whether narcotics activity was taking place.

¶34. As to this subissue, Cole attempts to analogize his case with that of *Carr v. State*, 770 So. 2d 1025 (Miss. Ct. App. 2000). In *Carr*, officers received a report of an auto burglary. *Id.* at 1027. While patrolling the area where the crime reportedly occurred, officers observed

15

Carr riding a bike along the roadway, with a cordless telephone in hand and a flashlight protruding from his pants pocket. *Id.* One of the officers asked Carr to stop. *Id.* Carr apparently complied with the request initially, but then fled on foot as the officer approached. *Id.* In response, the officers gave chase, captured Carr, searched his person, and detained him upon finding gold jewelry and another person's checkbook. *Id.* It was determined that the phone, flashlight, jewelry, and checkbook all were taken from a burglarized residence. *Id.* As a result, Carr was convicted for burglary of a dwelling. *Id.*

¶35. On appeal, Carr argued that the items seized from his person should have been suppressed, as he was searched without having given consent, and his arrest was undertaken without a warrant or probable cause. *Id.* In reviewing the evidence, the Court of Appeals agreed and held:

> The evident problem in this case is that the search of Carr's person that produced much of contraband was, beyond question, substantially more intrusive than a *Terry* patdown for weapons . . . . The fact, standing alone, that Carr fled rather than voluntarily submit to the officer's verbal command to stop justified further investigatory work by the officer, but it did not give rise to reasonable cause to arrest. Absent a lawful arrest, there could, of course, be no search incident to arrest.

*Id.* at 1028. Therefore, the Court of Appeals held that Carr's motion to suppress the evidence should have been granted. *Id.*

¶36. In applying *Carr* to his case, Cole argues that "[t]he [agents] inquiring with the individuals outside of a house on Martin Luther King, Jr. Drive and finding marijuana on one person [did] not give the [agents] reasonable cause to search or arrest [him]." Comparing *Carr* to Cole's case, however, we find the present matter is distinguishable.

16

¶37.    First, Cole seemingly ignores all the events that transpired between the moment that marijuana was discovered on the first individual and the ultimate decision that he needed to be frisked.  Thus, Cole's contention that marijuana being found on "one person [did] not give the [agents] reasonable cause to search or arrest [him]" is inaccurate—the record reveals that at least three individuals were found to be in possession of marijuana prior to the decision to frisk him.  Secondly, having discovered contraband *and a weapon* on other individuals in the group of interest, reasonable suspicion was further established by the agents to lawfully detain Cole, in accord with *Terry*.  *See Terry*, 392 U.S. at 30.  And lastly, unlike *Carr*, Cole temporarily was detained *prior* to fleeing from the agents.  *See Carr*, 770 So. 2d at 1027.

¶38.    As such, we hold that *Carr* is not analogous to Cole's case, as *Carr* did not involve an anonymous tip, implicate a group rather than an individual, or involve independent police investigation before a suspect was placed into custody. *See generally Carr*, 770 So. 2d 1025.  Thus, while *Carr* involved an arrest and search without independent investigation or probable cause, such is *not* the case here.

¶39.    Therefore, we cannot hold here that the scope of the investigatory stop was exceeded by the agents' conduct.  The agents were there to investigate possible narcotics activity.  Through their investigation, they discovered marijuana and a firearm.  Having discovered a firearm, the agents were justified in their decision to conduct a *Terry* frisk of Cole's person in order to determine whether he possessed a weapon that could be used to assault the agents.  *See Terry*, 392 U.S. at 30.  So, again, we find that the agents' stop was lawful both at its inception and in its scope.

17

### D. Unprovoked Flight

¶40. Cole further maintains that **Carr** affirms that the agents' conduct here exceeded the permissible scope of the stop, notwithstanding his "alleged flight."

¶41. To begin, we acknowledge that the record testimony is unclear as to whether Cole actually was frisked prior to his flight, but whether a frisk occurred is not dispositive to our analysis.[8] That said, from all of the agents' testimony in the record, it appears that as the agents—or at the least, Huff—attempted to approach Cole to frisk him, Cole, who was acting nervously at that time, stood and then fled. It is also unclear from the record whether Cole was instructed to stand, or if he did so under his own volition—regardless, Cole stated that as he stood, Huff instructed him to place his hands behind his back. Cole then testified that Huff grabbed one of his hands and placed his other hand on Cole's waist. According to Cole, that is "when the pistol fell down [his] leg." The Court can only presume that after the pistol "fell down [Cole's] leg," he chose to flee. When asked why he fled, Cole stated that he felt like he was "about to be placed under arrest," and that he "didn't want to [go] to jail." **Id.** at 50-51.

¶42. To this end, Cole asserts that his "refusal to cooperate, without more, [did] not furnish the minimum level of objective justification needed for a detention or seizure." *See* **Illinois**

---

[8] For purposes of a **Terry** frisk, an officer is entitled "to conduct a carefully limited search of the outer clothing of [a suspect] in an attempt to discover weapons which might be used to assault [the agents]." **Terry**, 392 U.S. at 30. As such, because it is unclear whether a frisk occurred in part, or at all, we conclude that the **Terry** frisk was not completed. Therefore, because Cole fled before the **Terry** frisk presumably was completed, we find that the agents were "justified in [their] pursuit of [Cole] for the purpose of completing [their] **Terry** stop." **Cooper**, 145 So. 3d at 1173.

*v. Wardlow*, 528 U.S. 119, 125, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000). The Supreme Court in *Wardlow* went further, however, and articulated the differences between a suspect's refusal to cooperate and his unprovoked flight. *Wardlow*, 528 U.S. at 124-25. Specifically, the Court stated:

> Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such *. . . . But unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not "going about one's business[;]" in fact, it is just the opposite.* Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning.

*Id.* (emphasis added). Thus, whether Cole had been frisked prior to his flight, he was up to that point lawfully detained under *Terry* and temporarily not free to leave. *See generally Terry*, 392 U.S. 1. His unprovoked flight, however, was without question a "consummate act of evasion," designed to prevent his further detention and carried out by his desire to avoid jail. *Wardlow*, 528 U.S. at 125.

¶43. Therefore, we find that Cole's flight—having been lawfully detained on grounds of reasonable suspicion—provided the agents with further justification to pursue him for purposes of completing their *Terry* stop. *See Cooper*, 145 So. 3d at 1173.

## II. Probable Cause to Arrest

¶44. Despite compounding the circumstances of the investigatory stop with Cole's flight, Cole still maintains that the agents lacked probable cause to arrest him, and then search for, and later seize, the marijuana and firearm. In Cole's view, he had "the right to resist an unlawful arrest." We can only assume that Cole's reference to an "unlawful arrest" is based

19

upon his belief that he was "about to be placed under arrest" following the determination that he needed to be frisked. For a variety of reasons, however, we find this argument unpersuasive.

¶45. First, as noted above, Cole admitted that he had not been placed in handcuffs, and that no one had told him that he was under arrest. *See Jackson*, 335 So. 2d at 118-19. Rather, up to the point that he fled, the agents merely were trying to conduct a *Terry* frisk of Cole's person, which we have held was justified under the circumstances. Second, this Court has found that where a *Terry* stop has not been completed due to a suspect's flight, the officers are provided with further reasonable suspicion to justify pursuit. *See Cooper*, 145 So. 3d at 1173; *see also Carr*, 770 So. 2d at 1028. But third—and most important, however—is that this Court ultimately has held "that if a suspect flees from the police *when he has been detained on reasonable suspicion, the officers acquire probable cause to effectuate an arrest.*" *Dies*, 926 So. 2d at 920 (citing *Mitchell v. State*, 792 So. 2d 192, 204 (Miss. 2001)) (emphasis added); *see also Sibron v. New York*, 392 U.S. 40, 66–67, 88 S. Ct. 1889, 20 L. Ed. 2d 917 (1968).

¶46. Therefore, based upon the totality of the circumstances surrounding the stop, we find that the agents' decision to conduct a *Terry* frisk of Cole's person was justified. And so, Cole's subsequent, unprovoked flight from his lawful, temporary detention provided the agents with further reasonable suspicion to pursue him—and ultimately—the probable cause necessary to effectuate an arrest. *See Dies*, 926 So. 2d at 920. Thus, we find Cole's arguments as to this subissue without merit—but our analysis does not end there.

20

### A. Abandoned Contraband

¶47. Having determined that the agents possessed probable cause lawfully to arrest Cole, we find it necessary to address the contraband abandoned by Cole while fleeing, as he sought to have those abandoned items suppressed.

¶48. We reiterate, however, that at the moment Cole fled, he was temporarily detained—that is, he was being frisked, or about to be frisked. As such, Cole was neither under arrest nor in custody when he discarded the contraband in his possession. *Jackson*, 335 So. 2d at 118-19.

¶49. As to abandoned contraband, we find controlling this Court's previous holding in *Harper v. State*, 635 So. 2d 864 (Miss. 1994). In *Harper*, this Court held that abandonment of objects during flight removes any protection of the law as to unreasonable searches and seizures. *See id.* Specifically, this Could stated: "[Harper] was not restrained or stopped at the time he threw down the [contraband], and the [contraband], therefore was abandoned and not the fruit of an unlawful seizure or arrest." *Id.* at 867. The *Harper* Court's reasoning, however, was guided by the principle set forth in *Hodari*, which held that evidence seized after being abandoned by a fleeing suspect is not tainted as fruit of an illegal seizure. *Id.* (citing *Hodari*, 499 U.S. at 629).

¶50. And so, taken together, *Hodari* and *Harper* conclusively demonstrate that the abandoned contraband in this case was seized lawfully by the agents.[9] Again, the record testimony reveals that Cole discarded what appeared to be a white hand towel while running

---

[9] *See generally*, *Hodari*, 499 U.S. 621; *Harper*, 635 So. 2d 864.

along the roadway. While pursuing Cole, Barlow stated that he heard what sounded like metallic clinking along the pavement, and that when he looked down, he observed a revolver and alerted the other agents to its presence. When inspected by Leggett, the towel was found near a firearm. In close proximity to the pistol was said to be marijuana. The firearm and the marijuana were said to be "in the street."

¶51. Therefore, in light of these facts, we conclude that Cole was not considered arrested under the Fourth Amendment until he was captured by the chasing agents and placed into custody. *See Jackson*, 335 So. 2d at 118-19; *see also Hodari*, 499 U.S. at 626. This is because Cole was in no way restrained during his flight, and therefore, "no arrest occurred within the confines of the Fourth Amendment." *Harper*, 635 So. 2d at 866 (citing *Hodari*, 499 U.S. at 626). Furthermore, because "a person relinquishes any privacy rights" as to property that is abandoned or discarded when fleeing from police, Cole cannot rely upon the Fourth Amendment for protection. *Johnson v. State*, 22 So. 3d 1229, 1234 (Miss. Ct. App. 2009). What is more, by abandoning this contraband on a roadway, Cole "placed his items on public property, which also diminishe[d] his Fourth Amendment protections against unreasonable searches and seizures." *Id.* at 1235 (citing *Katz v. United States*, 389 U.S. 347, 351, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967)).

¶52. As such, we hold that the circuit court did not err in admitting into evidence the firearm and marijuana found in the street because Cole surrendered his Fourth Amendment protections as to those items.

### B. Search Incident to Arrest

22

¶53.   Lastly, because we find that the pursuit, seizure, and ultimate arrest of Cole were legal, it necessarily follows that the additional marijuana found on his person was lawfully obtained—therefore, it was not fruit of the poisonous tree. That is because a "custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment[.]" ***Riley v. California***, 134 S. Ct. 2473, 2483, 189 L. Ed. 2d 430 (2014). "[T]hat intrusion being lawful, [then,] a search incident to the arrest requires no additional justification." ***Id.*** As such, we can find no error by the circuit court.

## CONCLUSION

¶54.   In sum, we hold that, under ***Terry***, the agents possessed a valid, reasonable suspicion that Cole was engaged in criminal activity and possibly armed. We base this conclusion upon the information contained in the anonymous tip *and* the agents' independent observation and investigation. Therefore, it follows that Cole was lawfully and temporarily detained for the purpose of the agents to complete their ***Terry*** stop. That being so, we also hold that the agents acquired the probable cause necessary to arrest Cole when he fled. And because Cole abandoned the contested contraband in a public street, Cole had no reasonable expectation of privacy in those items. Moreover, once Cole was captured and placed into custody, the additional marijuana found on his person was lawfully seized. Therefore, evidence of the seized contraband was admissible against Cole, and not the fruit of an illegal search or seizure.

¶55.   For those reasons, the circuit court did not err in denying Cole's motion to suppress—therefore, we affirm the judgment of the circuit court.

23

¶56.   **AFFIRMED.**

**WALLER, C.J., RANDOLPH AND KITCHENS, P.JJ., KING, COLEMAN, MAXWELL, BEAM AND CHAMBERLIN, JJ., CONCUR.**