# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-00811-COA

DYLAN CHASE DAVIS A/K/A DYLAN DAVIS        APPELLANT

v.

STATE OF MISSISSIPPI        APPELLEE

DATE OF JUDGMENT: 06/01/2023
COURT FROM WHICH APPEALED: DESOTO COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT: OFFICE OF STATE PUBLIC DEFENDER
         BY: JUSTIN TAYLOR COOK
ATTORNEY FOR APPELLEE: OFFICE OF THE ATTORNEY GENERAL
         BY: ALEXANDRA LEBRON
DISTRICT ATTORNEY: ROBERT R. MORRIS
NATURE OF THE CASE: CRIMINAL - FELONY
DISPOSITION: AFFIRMED - 12/10/2024
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., McDONALD AND EMFINGER, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1. Dylan Chase Davis was indicted by a DeSoto County grand jury on a charge of being a felon in possession of a firearm. Before trial, Davis moved to suppress the firearm he was charged with carrying, claiming it was the fruit of an unlawful seizure. The trial court denied the motion, a jury convicted Davis as charged, and the trial court sentenced him to a suspended five-year term of incarceration and placed Davis on five years of post-release supervision. Davis moved for judgment notwithstanding the verdict or, in the alternative, a new trial, specifically raising the trial court's denial of his motion to suppress as an issue. The trial court denied the post-trial motion, and Davis appeals, arguing that the trial court

erred in failing to suppress the firearm as evidence when Davis was personally detained, allegedly in violation of his Fourth Amendment rights. After reviewing the record, the parties' arguments, and relevant precedent, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     On the morning of June 27, 2021, around 3:00 a.m., Officer Vaughn, who was parked in the highway median, noticed Davis walking on Interstate 55 (I-55). Vaughn observed Davis was sweating and saw that Davis had a knife in his waistband. Vaughn asked Davis where he was going, and Davis responded but kept walking. Vaughn instructed Davis to stop, and noticing a bulge in Davis's pocket, Vaughn asked if Davis had a gun. Davis said he did and consented to Vaughn removing it. When Vaughn learned that Davis was a felon, Vaughn subsequently took Davis into custody and charged Davis with being a felon in possession of a firearm.

*Motion to Suppress and Hearing*

¶3.     Prior to trial, Davis filed a motion to suppress the firearm, arguing that Vaughn violated Davis's Fourth Amendment rights. Specifically, Davis contended that Vaughn lacked reasonable suspicion to perform an investigatory stop, also known as a *Terry* stop.[1] Consequently, Davis argued that the evidence from Davis's unlawful stop and subsequent search should have been suppressed under the exclusionary rule. In its response, the State argued that Davis's consent was voluntary because Davis was being "generally cooperative." Alternatively, the State contended that the seizure was valid as a community caretaking

---

[1] *See Terry v. Ohio*, 392 U.S. 1 (1968).

2

function, although Davis contended that Vaughn never inquired about Davis's safety.

¶4.     At the suppression hearing, Vaughn testified that during his patrol, he saw Davis walking northbound in the southbound lane of traffic on I-55. Vaughn stated that he noticed Davis "walking in the lane of travel, but close to the white line."[2] Vaughn also noticed that Davis was "sweating profusely" and was carrying "what appeared to be a large knife in his pocket." Vaughn waited for Davis to get closer, and as Davis was walking past the patrol vehicle, Vaughn testified that he felt the need to check on Davis's welfare, stating:

> I got out of my patrol vehicle. And as he was walking past my vehicle, I asked him where he was headed. He advised he was headed to Illinois, and he continued walking. I advised him to stop, come over in the median, and talk to me.

¶5.     When Davis reached the median, Vaughn asked him if he (Vaughn) could remove the knife. Vaughn also asked Davis for his identification and noticed a bulge in the front of Davis's pants. Vaughn asked Davis if the bulge was a firearm, and Davis said "yes." According to Vaughn, Davis consented to Vaughn's taking possession of the gun. After removing the firearm, Vaughn asked Davis if he was a convicted felon, to which Davis answered that he was not. When Vaughn checked for Davis's criminal history, he learned that Davis had been convicted of a felony.[3] Vaughn took Davis into custody, and Davis was subsequently indicted for possession of a firearm by a felon.

---

[2] There are conflicting accounts of where Davis was physically positioned in the roadway when Vaughn saw him. Davis testified that he walked in the shoulder, off the road, and only stepped in the middle of the road because he had to walk around Vaughn's patrol vehicle.

[3] Davis was previously convicted of attempted burglary of a habitation with intent to commit theft in Bexar County, Texas, and sentenced on June 3, 2013.

3

¶6.     Vaughn stated that he spoke to Davis out of concern for Davis's safety:

Q:      And why did you advise him to come to the median?

A:      Because where he was walking was – you're either in the road or you're in the grass, and he was – the particular area he was in, the traffic is coming downhill.  So he would be walking uphill. So it wouldn't take anything for a vehicle to hit him where he was at.

Q:      And you weren't going to talk to him in the road, were you?

A:      Absolutely not.

Q:      So would you consider that you were checking on his welfare?

A:      Absolutely.

Q:      And for safety reasons you asked him to step into the median?

A:      Correct.

¶7.     Vaughn also stated that based on his past experiences with motor vehicle deaths on the interstate, Davis's walking in the middle of the interstate was "definitely a danger to him" (Davis).  Vaughn testified that it would not take long for a vehicle to hit him.  Vaughn continued that the entire encounter lasted no longer than thirty minutes.  Vaughn also testified that Davis voluntarily spoke to him and cooperated with his requests.  Lastly, Vaughn testified that "welfare checks" were commonly undertaken by officers who observed people walking on the interstate for many different reasons.

¶8.     On cross-examination, Vaughn was asked about the specific timing of his conversation with Davis:

Q:      Because the timing is crucial. He walked past your car and kept walking, according to your report, and you ordered him to come back to you, to stop and come back?

4

A: Well, I said "Stop. Come to the median and talk to me," yes sir.

Q: So would a reasonable person believe that he needed to stop and come back?

A: It's possible, yes –

Q: I mean, if an officer gives you a directive, don't you think a reasonable person is going to do what they asked you to do?

A: I would say that a reasonable person would stop and come back.

Vaughn also testified that the "welfare check" ended when he observed the bulge in Davis's pants, asked Davis what it was, and asked Davis if he could remove it. Lastly, Vaughn stated that he did not have reasonable suspicion that Davis had committed any crime prior to speaking with Davis and that if Davis decided to walk away, he would not have charged Davis with additional crimes.

¶9. At the close of the hearing, the State argued that just because Vaughn asked Davis to come to the median did not mean Davis was detained. Vaughn was "simply doing his job" by conducting a "welfare check." Davis, however, argued that Vaughn's command to come to the median was a seizure (i.e., detention) because a reasonable person would be afraid to leave. He further argued that the detention violated Davis's Fourth Amendment rights because, at that point, Vaughn had no reasonable suspicion to detain Davis. Davis also contended that his voluntary consent to the search was "illusory" because he did not know that he could leave. After hearing both arguments, the court denied Davis's motion to suppress, ruling from the bench that Vaughn was justified in making the stop, the knife was in plain view of the officer, and at the "lawful orders of the officer, the weapon was

5

produced." The trial court entered an order denying Davis's motion to suppress. The court specifically held:

> Considering the totality of the circumstances, particularly that the Defendant was visibly armed and posed a significant safety risk to himself and others while walking in the lanes of traffic of an interstate at night in a fairly remote area, the Defendant's activity was ambiguous *at the very least* and justified the officer's brief investigatory stop. The Defendant's voluntary disclosure to the officer that he was carrying a concealed firearm, coupled with his overall demeanor and ambiguous actions, justified further inquiry by the officer into whether the Defendant had been or was about to be engaged in criminal conduct. Once it was discovered by identification of the Defendant that he was a previously convicted felon, probable cause supported the Defendant's arrest for felony possession of a firearm.

*Trial*

¶10. At trial, Davis, his wife Tracy Lawless, and Vaughn testified. The State called Vaughn as the only witness in its case. Vaughn's testimony was essentially the same as his testimony during the hearing on the motion to suppress. He gave more specific details about his concern for Davis: "I was concerned for his safety. We've worked a lot of MVA deaths on the interstate, and with the location that he was actually at, he was walking – he was about to be walking up a hill, so traffic would be coming over that hill, and it was a very dangerous area to be walking in the roadway." On cross-examination, Davis's counsel asked Vaughn about Davis's need to walk in the middle of the road to get around him. Vaughn added that Davis could have walked in the grass or the gravel before walking on the side of the road.

¶11. Lawless testified that earlier that morning she, Davis, and her two boys decided to travel eight hours to Illinois to see Davis's mom. Sometime during the trip, Lawless and Davis began arguing. The two "bickered" back and forth, and Lawless ultimately pulled over

6

and she asked Davis to exit the vehicle.

¶12.    Davis testified that he stepped out of Lawless's car and retrieved some of his belongings from the trunk.  While Davis was gathering his things, several of Lawless's items fell out of the car—pillows, jumper cables, blankets, et cetera.  As Lawless drove away, Davis noticed that one of the items was Lawless's handgun.  Feeling obligated to return the gun to Lawless, and because he did not want to leave a gun unattended on the side of the road, Davis put the gun in his pocket and began walking on the shoulder of the interstate against the flow of traffic.  Davis testified that as he was walking, he called Lawless thirty-six times to come back and pick him up.

¶13.    The jury ultimately found Davis guilty of possession of a firearm by a felon.  In his subsequent motion for judgment notwithstanding the verdict or a new trial, Davis contended that the court had erred by denying his motion to suppress.  The court denied his post-trial motion at Davis's sentencing hearing and sentenced him to five years in the custody of the Mississippi Department of Corrections, with all five years suspended pending good behavior. The court also placed Davis on five years of post-release supervision (two years reporting and three years non-reporting).

¶14.    On appeal, Davis argues that the gun should have been suppressed because it was obtained during what Davis contends was an unreasonable and unlawful stop (seizure).

## STANDARD OF REVIEW

¶15.    Both the Fourth Amendment of the United States Constitution and Article III, Section 23 of the Mississippi Constitution protect an individual's right to be free from unreasonable

searches and seizures. *Scruggs v. State*, 313 So. 3d 1084, 1089 (¶17) (Miss. Ct. App. 2021) (quoting *Cole v. State*, 242 So. 3d 31, 38 (¶12) (Miss. 2018)). "Unreasonable-search-and-seizure claims require a mixed standard of review." *Buford v. State*, 323 So. 3d 500, 504 (¶11) (Miss. 2021) (quoting *Eaddy v. State*, 63, So. 3d 1209, 1212 (¶11) (Miss. 2011)). "Whether probable cause or reasonable suspicion exists is subject to a de novo review. But the Court limits the de novo review of the trial court's determination to 'historical facts reviewed under the substantial evidence or clearly erroneous standards.'" *Id.* (quoting *Eaddy*, 63 So. 3d at 1212 (¶11)). In determining whether evidence should be suppressed, a trial court's findings of fact will not be disturbed on appeal absent a finding the trial court "applied an incorrect legal standard, committed manifest error, or made a decision contrary to the overwhelming weight of the evidence." *McCollum v. State*, 372 So. 3d 980, 985 (¶14) (Miss. 2023) (quoting *Crawford v. State*, 192 So. 3d 905, 923 (¶78) (Miss. 2015)). "In reviewing the denial of a motion to suppress, we must determine whether the trial court's findings, considering the totality of the circumstances, are supported by substantial credible evidence." *Buford*, 323 So. 3d at 504 (¶11) (quoting *Moore v. State*, 933 So. 2d 910, 914 (¶9) (Miss. 2006)).

## DISCUSSION

¶16. Davis's only issue on appeal is whether the trial court erred in failing to suppress the firearm that was obtained, he contends, when he was detained in violation of his Fourth Amendment rights. Specifically, Davis argues that Vaughn seized Davis by ordering him to stop and come to the median without reasonable suspicion that Davis had committed, was

8

committing, or was going to commit a crime. The State contends that Davis was not unlawfully detained and that Davis's actions were consensual and voluntary while Vaughn performed a welfare check.

¶17. "The Mississippi Supreme Court has divided '[p]olice activity in preventing crime, detecting violations, making identifications, and apprehending criminals' into three types of action: (1) voluntary conversations, (2) investigative stops and temporary detentions, and (3) arrests." *Harrell v. State*, 109 So. 3d 604, 606 (¶8) (Miss. Ct. App. 2013) (quoting *Singletary v. State*, 318 So. 2d, 873, 876 (Miss. 1975)). "In an investigatory stop, an officer may 'stop and detain a person to resolve an ambiguous situation without having sufficient knowledge to justify an arrest[.]'" *Stewart v. State*, 367 So. 3d 985, 987 (¶7) (Miss. 2023) (quoting *Singletary*, 318 So. 2d at 876). Under appropriate circumstances, a law enforcement officer may be fully justified in providing assistance without needing any reasonable basis to suspect criminal activity. *Trejo v. State*, 76 So. 3d 684, 689 (¶14) (Miss. 2011) (quoting *State v. Brown*, 509 N.W. 2d 69, 71 (N.D. 1993)). This is known as the community caretaking function. *Id*.

¶18. The State argues that Vaughn's actions were justified as part of his community caretaking function.[4] Specifically, the State argues that under the totality of the

---

[4] Normally "[a]n investigative stop is permitted as long as an officer has some objective manifestation that the person stopped is, or is about to be engaged in criminal activity." *Wright v. State*, 334 So. 3d 1115, 1117 (¶8) (Miss. 2021). But here Vaughn admitted that he had no reason to believe that Davis had or was committing a crime, and the trial court denied Davis's motion to suppress based on Vaughn's community care-taker function authority, so we need not engage in a reasonable suspicion of criminal activity analysis.

circumstances, a reasonable person would have believed that Davis's safety was in danger and that he posed a risk to himself or other individuals on the interstate.

¶19.  The concept of the community caretaking function originated in *Cady v. Dombrowski*, 413 U.S. 433 (1973).  In that case, Chicago police officer Dombroski had a single-car accident, going off the road in Wisconsin.  *Id*. at 435-36.  When Wisconsin police met Dombroski, who was obviously drunk, they discovered that he was a law enforcement officer who did not have his service revolver on his person.  *Id*. at 436. They checked the glove compartment and front seat of the vehicle at the scene but did not find it.  *Id*. at 436. Dombroski was hospitalized, and his vehicle was searched again for the revolver after the car was towed to a private garage.  *Id*.  Officers were concerned that unauthorized persons could access the gun, and finding the gun was standard operating procedure because Dombroski did not have it on him.  *Id*. at 437.  In their search, Wisconsin police did not find the revolver but, instead, found various items covered in blood.  *Id*. at 437.  This discovery led to further investigation and ultimately Dombroski was charged with murder.  *Id*. at 434. Dombroski challenged the admission of those bloody items, arguing that law enforcement did not have a warrant to search his vehicle.  *Id*. at 439.  The trial court admitted the items, and Dombroski was convicted.  *Id*. at 434.  On appeal, the Supreme Court held that the warrantless search of the vehicle, which resulted in the discovery of the bloodied items, was justified because of law enforcement's motive "to protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands." *Id.* at 443.

¶20.  In describing these law enforcement's duties, the Supreme Court stated:

Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. *Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community care-taking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.*

*Id*. at 441 (emphasis added). The Supreme Court approved, stating that the officer's justification for the search, a "concern for the safety of the general public who might be endangered if an intruder removed a revolver from the trunk of the automobile" was reasonable. *Id*. at 447. The Supreme Court further noted that "where, as here, the trunk of an automobile, which the officer reasonably believed to contain a gun, was vulnerable to intrusion by vandals, we hold that the search was not 'unreasonable' within the meaning of the Fourth and Fourteenth Amendments." *Id.* at 448.

¶21.    Our state Supreme Court adopted the community caretaking function in *Floyd v. City of Crystal Springs*, 749 So. 2d 110, 112 (¶4) (Miss. 1999), where an off-duty officer received a report from a third party who told him that a vehicle was traveling at high speed in a reckless manner. The officer called in the description of the vehicle, and an on-duty officer pulled the vehicle over even though that officer had not personally observed any violation of traffic laws. *Id*. at (¶5). The officer observed an open bottle of vodka on the seat, *id*. at (¶6), and ultimately, Floyd was charged, tried, and convicted of driving under the influence. *Id*. at 113 (¶10). The Supreme Court held that there was reasonable cause for the officer's

investigatory stop, stating:

> Reasonable cause for an investigatory stop may be based on an officer's personal observation or on an informant's tip if it bears indicia of reliability. Reasonable suspicion is dependent upon both the content of the information possessed by the detaining officer as well as its degree of reliability. Both factors—quantity and quality—are considered in the "totality of the circumstances."

*Id.* at 118 (¶30) (citations omitted). However, the Supreme Court acknowledged the community caretaking function and emphasized law enforcement's need to perform "investigatory activity" to protect the public:

> The public concern served by the seizure is evident—a reckless driver poses a mortal danger to others. There exists in such a situation an absolute necessity for immediate investigatory activity. The severity of the interference with individual liberty was minimal—Floyd was required to pull over to the side of the road. Officer Palmer had a duty to investigate the detailed complaint given to the police department concerning a driver who may have been ill, impaired, reckless, or dangerous to the public.

*Id.* at 117 (¶27).

¶22.    In *Trejo v. State*, 76 So. 3d 684, 688-89 (¶¶12-13) (Miss. 2011), the Supreme Court acknowledged that it had adopted the community caretaking function in *Floyd* and discussed the concept in more detail and how courts should apply it. *Id*. at 689 (¶14). In that case, a police officer pulled Trejo over because of his concern that the driver may have been intoxicated or tired, not because of any traffic violation. *Id*. at 686 (¶3). Subsequently, law enforcement discovered cocaine strapped to Trejo's girlfriend's body. *Id*. at (¶5).

¶23.    Prior to trial, Trejo challenged the legitimacy of the stop and admission of the drugs in a motion to suppress, which the trial court denied. *Id*. at 687 (¶6). The trial court found that Trejo was stopped for "safety reasons," namely "to check for the impairment of the

12

driver, whether it was alcohol or sleep deprivation or what [ever] else[,]" to prevent an accident. *Id.* A jury found Trejo guilty of possessing cocaine with intent to sell and the court sentenced him as a habitual offender. *Id*. at 687 (¶6). On appeal, this Court reversed, finding that there was no reasonable basis for the stop and that the trial court had erred in denying the motion to suppress the evidence. *Id*. at 687. The Supreme Court granted the State's petition for writ of certiorari, explaining the community caretaking function and how courts should apply it to determine if a detention is lawful:

> [W]e conclude that the community caretaking function in *Cady* may apply in contexts other than inventory searches, as the police provide many functions apart from investigating criminal activity. But only under appropriate circumstances may a law enforcement officer be fully justified in stopping a vehicle to provide assistance, without needing any reasonable basis to suspect criminal activity.

*Id*. at 689 (¶14) (citations omitted). The Court stated that "the ultimate standard is reasonableness." *Id.* (citing *Cady*, 413 U.S. at 439). Reasonableness under this analysis, the Court stated, is an objective standard:

> As with other Fourth Amendment analyses, this Court will not try to determine the subjective intent of the person making the stop but will examine whether the stop is objectively reasonable. In doing so, we look to whether the stopping officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the stop. The question becomes whether a reasonable person, given the totality of the circumstances, would believe the individual is in need of help or that the safety of the public is endangered.

*Id*. (internal quotation marks omitted).

¶24. When examining the reasonableness of Trejo's stop, the Court noted that the facts did not establish that Trejo was in any need of help. *Id*. at 690 (¶16). Trejo was driving well

above the minimum speed limit of 45 miles per hour and under the maximum speed limit of 70 miles per hour; there was no evidence of erratic driving; no traffic prevented the officer from passing Trejo in the right lane, and the fact that a failure to change lines "isn't necessarily indicative of distress." *Id*. The Supreme Court also noted, as this court did, that Trejo immediately pulled over as the officer flashed his blue lights, suggesting that he was unaware rather in distress. *Id*. Accordingly, the Supreme court held that the community caretaking function did not justify the officer's initial stop. *Id*. The Court held that although the community caretaking function was a viable doctrine, in Trejo's case, "the facts presented at the suppression hearing did not justify a reasonable belief that Trejo needed help or that the public was endangered, and as such, the trial court should have granted Trejo's motion to suppress." *Id*.

¶25. In the case at hand, considering the totality of the circumstances, we find that Vaughn's stopping of Davis was a justified safety stop under the community caretaking function. Vaughn testified that he saw Davis walking along I-55 at 3:00 a.m. in the darkness of the morning and felt Davis needed help. In light of the 70-mile-per-hour speed limit, Vaughn testified that "it wouldn't take anything" for a vehicle to hit Davis, who was walking uphill in a lane of traffic heading downhill. Vaughn also relied on his experience as an officer, noting the many motor vehicle accident deaths he's worked and noting that the hills in the area where Davis was walking made it "a very dangerous area to be walking in the roadway." Because of these circumstances, Vaughn said he wanted to check on Davis's welfare.

14

¶26. Vaughn testified that he spotted Davis walking in the middle of the road, "sweating profusely." Vaughn waited for Davis to walk by the patrol vehicle and saw a knife in Davis's pocket. Vaughn asked Davis where he was going, to which Davis answered, "Illinois," and continued walking without further explanation, passing by Vaughn entirely. At this point, Vaughn felt compelled to inquire about Davis's safety even further and told Davis to stop and come to the median and talk to him, to which Davis complied. Considering the totality of the circumstances—the time of the morning, Davis's physical appearance, the hundreds of miles he was attempting to walk along a major interstate, the dangerousness of the area, and the ambiguous nature of the encounter, it was reasonable for Vaughn to believe that Davis needed help. The trial court noted all these facts, which are supported by substantial credible evidence, and, in light of our standard of review, we find no basis to disturb the trial court's findings or the denial of Davis's motion to suppress. *McCollum*, 372 So. 3d at 985 (¶14).

¶27. We caution, however, that the community caretaking function is not meant to extend law enforcement's authority to stop people randomly claiming "safety concerns." Reiterating *Trejo*, we follow our Supreme Court's instruction to "carefully analyze the totality of the circumstances, so that the community caretaking function is 'cautiously and narrowly applied in order to minimize the risk that it will be abused or used as a pretext for conducting an investigatory stop and search for criminal evidence.'" *Id*. at 689 (¶14). We do so by examining the totality of the circumstances on a case-by-case basis.

**CONCLUSION**

15

¶28. Because we find that the trial court did not err in determining that Officer Vaughn's stop of Davis was a legitimate use of the officer's authority under a community caretaking function analysis, we hold that the trial court did not err in denying Davis's motion to suppress the firearm. Accordingly, we affirm Davis's conviction and sentence.

¶29. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McCARTY, SMITH, EMFINGER AND WEDDLE, JJ., CONCUR. LAWRENCE, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**