# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-KM-01581-COA

JAMES SIMS A/K/A JAMES ARTHUR SIMS, JR.             APPELLANT

v.

STATE OF MISSISSIPPI                                  APPELLEE

DATE OF JUDGMENT:           07/09/2019
TRIAL JUDGE:                HON. CELESTE EMBREY WILSON
COURT FROM WHICH APPEALED:  DESOTO COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:    WANDA TURNER-LEE ABIOTO
                            MARY A. BROWN
ATTORNEY FOR APPELLEE:      OFFICE OF THE ATTORNEY GENERAL
                            BY:  ASHLEY LAUREN SULSER
DISTRICT ATTORNEY:          JOHN CHAMPION
NATURE OF THE CASE:         CRIMINAL - MISDEMEANOR
DISPOSITION:                AFFIRMED - 05/04/2021
MOTION FOR REHEARING FILED: 05/18/2021 - DENIED; AFFIRMED -
                            09/21/2021
MANDATE ISSUED:

**EN BANC.**

**LAWRENCE, J., FOR THE COURT:**

## MODIFIED OPINION ON MOTION FOR REHEARING

¶1.     The motion for rehearing is denied.  The original opinion of this Court is withdrawn, and this modified opinion is substituted in its place.

¶2.     James Sims was convicted of disorderly conduct[1] and resisting arrest[2] in the Southaven Municipal Court.  He subsequently appealed his convictions to the DeSoto County

---

[1] *See* Miss. Code Ann. § 97-35-7(1)(i) (Rev. 2014).

[2] *See* Miss. Code Ann. § 97-9-73 (Rev. 2014).

County Court. Following a bench trial de novo, the county court judge found Sims guilty of both crimes. The court sentenced Sims to serve six months of supervised probation for the disorderly-conduct conviction and a consecutive six months of unsupervised probation for the resisting-arrest conviction. Sims was also ordered to complete an anger management course and pay $1,058 in fines, costs, and assessments. Sims then appealed to the DeSoto County Circuit Court, which affirmed the county court's judgment. The circuit court allowed Sims to file an out-of-time appeal, which resulted in his appeal now before this Court.

¶3.     On appeal, Sims argues that his convictions should be reversed because (1) the City of Southaven (City) committed a *Brady*[3] violation; (2) the City presented perjured testimony; (3) the evidence was insufficient to support his convictions; and (4) the trial court's judgment was against the overwhelming weight of the evidence. Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶4.     On January 7, 2016, at approximately 8:45 p.m., Detective Tara Crum with the Southaven Police Department was dispatched to the SuperLo Foods store (SuperLo) in response to a shoplifting call. When she arrived, a security guard informed her that he had a female suspect detained in the store and that there was possibly a "second individual" in the area. At that point, Detective Crum radioed for other officers in the area to come and assist. Shortly after, three or four officers arrived to help her look for the second suspect.

¶5.     The security guard helped two of the responding officers locate the vehicle that

---

[3] *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

2

possibly belonged to the shoplifters. The vehicle was empty, which led them to believe that the male suspect was still in the area. Officer Chase Joiner, one of the responding officers, testified that the other officers broadcasted over the radio that they saw a rifle in the back of the car. At that point, Officer Joiner parked his vehicle in the parking lot facing the SuperLo to watch for the male suspect.

¶6.     Shortly after, Sims walked out of the restaurant Tiger Hot Wings. Officer Joiner watched Sims leave the restaurant, turn left toward the SuperLo, and take four or five steps. Sims then stopped "abruptly" when he saw the officers at the SuperLo and walked in the opposite direction. Officer Joiner found this behavior to be "unnatural" and "suspicious" and continued to watch Sims.

¶7.     As Sims continued to walk away, he looked back at Officer Joiner "five or six times." Based on his behavior, Officer Joiner drove his car toward Sims and pulled into the parking lot that Sims had just entered on foot. He rolled his window down and said he wanted to talk. Sims kept walking and said, "For what man? What do you want?" At that point, Officer Joiner turned on his blue lights and got out of his patrol vehicle. After being asked several times, Sims finally walked back toward Officer Joiner in an aggressive manner with his hands in his pocket and said, "What the f*** do you want?" Around this time, Officer Joiner's partner, Officer Phillip Croy, arrived to assist. Officer Joiner asked Sims several times to take his hands out of his pockets, and "he refused every single time." Officer Joiner testified that there were other people in the parking lot and the surrounding area during this

3

exchange.

¶8.　Officer Joiner testified that he could not remember whether he had to physically remove Sims's hands from his pockets or whether Sims removed them voluntarily.  Either way, Sims eventually placed his hands on the hood of Officer Joiner's patrol vehicle, and Officer Joiner conducted a pat-down search to look for weapons.  Officer Joiner testified that at this point, based on the totality of the circumstances, he believed that Sims was likely involved with the shoplifting incident.  Officer Joiner asked Sims to place his hands behind his back, and, at that point, Sims said, "No.  F*** you."  Officer Joiner ultimately detained Sims to "identify [Sims] and . . . to confirm or dispel the suspicions [he] had regarding the shoplifting."  At that time, Officer Joiner had not decided whether to arrest Sims.  Sims refused to take his hands off the hood of the vehicle and place them behind his back, so Officers Joiner and Croy physically moved his hands and placed the handcuffs.  Officer Joiner testified that Sims was cursing them loudly and acting "irate."  After Sims was handcuffed, he was still not compliant and continued to physically pull away.  Officer Joiner stated there was a "brief struggle" and that Sims was eventually placed in the patrol vehicle and driven to the police station.

¶9.　Once Sims was identified, it was discovered that there was a warrant for his arrest for contempt, which Officer Joiner suspected was the reason for his behavior.  Officer Joiner also testified that it was later discovered that Sims had nothing to do with the shoplifting incident.  Once they arrived at the station, Sims "jerked away" from Officer Joiner and

4

refused to cooperate. Officer Croy's testimony at trial corroborated Officer Joiner's recount of the events leading up to Sims's arrest. Sims was ultimately charged with disorderly conduct, resisting arrest, and public profanity.[4]

¶10.    Sims testified that he did not head toward the SuperLo when he left Tiger Hot Wings as stated by Officer Joiner. He instead claimed he was walking to a nearby gas station. Sims also claimed that Officer Joiner was lying during most of his testimony. Sims admitted to seeing Officer Joiner's patrol vehicle but claimed he only glanced at it initially. Sims also testified that he immediately complied and stopped walking as soon as he heard Officer Joiner speak to him. He stated that he never had a chance to put his hands behind his back and that the officers threw him against the car and handcuffed him. Finally, Sims denied knowing that he had a warrant out for his arrest for contempt of court until Officer Joiner told him.

¶11.    On May 11, 2016, Sims was convicted of disorderly conduct and resisting arrest in municipal court. He appealed the judgment to county court. The county court held a bench trial, which occurred on December 4, 2017, and February 13, 2018. At the close of trial, the county court found Sims guilty of disorderly conduct and resisting arrest. Sims subsequently filed an untimely motion for judgment notwithstanding the verdict (JNOV) or alternatively, a new trial. The county court ultimately found Sims's delay in filing was a result of

---

[4] The public profanity charge was later dismissed. Additionally, Sims pled guilty to the outstanding contempt-of-court charge.

5

"inadvertence" and denied Sims's post-trial motion pursuant to Mississippi Rule of Criminal Procedure 25.1(c). Sims then appealed the county court's judgment to circuit court on March 12, 2018. Sims and the City submitted briefs for the court's review. After reviewing the briefs and the county court record, the circuit court affirmed the county court's judgment on July 9, 2019, under Mississippi Rule of Criminal Procedure 30.1(c).[5] Sims appealed.

## STANDARD OF REVIEW

¶12. "In a bench trial, the trial judge is 'the jury' for all purposes of resolving issues of fact." *Sendelweck v. State*, 101 So. 3d 734, 738-39 (¶19) (Miss. Ct. App. 2012) (citing *Evans v. State*, 547 So. 2d 38, 40 (Miss. 1989)). "As such, a 'judge sitting without a jury is accorded the same deference with regard to his findings as a chancellor, and his findings are safe on appeal where they are supported by substantial, credible, and reasonable evidence.'" *Carlson v. City of Ridgeland*, 131 So. 3d 1220, 1223 (¶13) (Miss. Ct. App. 2013) (citing *Doolie v. State*, 856 So. 2d 669, 671 (¶7) (Miss. Ct. App. 2003)).

---

[5] Rule 30.1(c) requires a circuit court to affirm a county court's judgment when there is no prejudicial error:

> On appeal, legal arguments may be heard in any county within the jurisdiction of the circuit court and shall be considered solely on the record made in county court. If no prejudicial error be found, the circuit court shall affirm and enter judgment in like manner as affirmances in the Supreme Court. If prejudicial error be found, the circuit court shall reverse as is provided for reversals in the Supreme Court. If a new trial is granted, the cause shall be placed on the docket of the circuit court and a new trial held therein de novo.

MRCrP 30.1(c).

# ANALYSIS

## 1. The City did not commit a *Brady* violation.

¶13.    Sims argues that the City committed a *Brady* violation by suppressing audio recordings between the officers who responded to the shoplifting incident at the SuperLo. More specifically, Sims claims that "the [exculpatory] information passed between the officers on the radio would have shown that at the time Officer [Joiner] stopped [Sims] that he knew that Sims was not involved in the shoplifting incident at the grocery store."

¶14.    The week before trial, Sims filed a motion requesting additional evidence, which included the alleged audio recording and subpoenas for several employees at the police department.  On the first day of trial, the City maintained that it had provided everything requested through discovery, including "an audio recording in the sallyport as well as dispatch recordings."  The next day, defense counsel sent the City prosecutor a letter, again requesting additional evidence and subpoenas.  The City filed a motion to quash the request for the subpoenas, and the court heard the matter on what was supposed to be the second day of trial.  The City reiterated that it had provided all the available requested evidence it had to Sims.  Although the court had "a real problem with [defense counsel's] sloppiness" in waiting until "the last minute," it entered an order the same day of the hearing requiring the City to provide "a complete record of the dispatch recordings for the time and date relevant to the facts in this case."  When trial resumed February 13, 2018, there was no further discussion of any missing evidence.  The City contended that it fully complied with the

7

county court's order.

¶15.    In *Brady v. Maryland*, the United States Supreme Court held that a prosecution's suppression "of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.  To succeed on his *Brady* claim, Sims must prove that (1) the State possessed evidence favorable to the defendant; (2) Sims did not possess the evidence, nor could he obtain it himself with any reasonable diligence; (3) the State suppressed the favorable evidence; and (4) had the evidence been disclosed to Sims, there is a reasonable probability that the outcome of his proceedings would have been different. *Claiborne v. State*, 176 So. 3d 769, 773-74 (¶13) (Miss. 2015).  First and foremost, Sims cannot prove that the City possessed any additional audio recordings between the officers.  Second, Sims cannot prove that had the City possessed this alleged "exculpatory" information, the outcome of his trial would have been different.  Officer Joiner testified as to why he detained (and eventually arrested) Sims, and Officer Croy corroborated Officer Joiner's testimony to the extent he was present.  Regardless of any audio recordings prior to Sims's arrest, the fact remains that none of those recordings would change the circumstances surrounding Sims's arrest for the charges of disorderly conduct and resisting arrest.  For these reasons, Sims's *Brady* claim fails.

    **2.    The City did not present perjured testimony.**

¶16.    Sims claims that Officer Joiner committed perjury when he testified that he heard

8

another officer state on the radio that a rifle was in the suspect's vehicle. Sims further claims

Officer Joiner "fabricated" that information to justify stopping Sims in the parking lot.

¶17.    "The prosecution violates the defendant's rights under the Fourteenth Amendment to

the United States Constitution when it knowingly presents false evidence or allows it to go

uncorrected when it appears." *Robinson v. State*, 247 So. 3d 1212, 1235 (¶59) (Miss. 2018),

*cert. denied* 139 S. Ct. 829 (2019).  To prove the defendant's rights have been violated, a

defendant "must first demonstrate that a prosecution witness knowingly provided false

testimony." *Id*. at (¶59) (citing *Havard v. State*, 86 So. 3d 896, 901 (¶18) (Miss. 2012)).  A

new trial is appropriate when the false testimony has "any reasonable likelihood" that may

"affect[] the judgment of the [fact finder]." *Id*. (quoting *Napue v. Illinois*, 360 U.S. 264, 271

(1959)).

¶18.    At trial, Officer Joiner was the only witness to testify that he heard an officer state

there was a rifle in the suspect vehicle.  The dispatcher testified that she could not recall if

any officer made that exact statement.  Additionally, one of the responding officers testified

that he did not recall seeing a rifle in the vehicle but also admitted he could not "recall a

whole lot" since the incident occurred nearly two years prior.

¶19.    After review, we find that Sims is unable to meet his burden to prove that Officer

Joiner "knowingly provided false testimony." No other witness contradicted Officer Joiner's

testimony.  The State's witnesses could not recall all the details, presumably because of the

time lapse between the incident and trial.  Further, Sims fails to show how this alleged false

9

testimony would have had "any reasonable likelihood" to affect the trial court's judgment. *Id*. Accordingly, this issue is without merit.

### 3. There is sufficient evidence to support Sims's convictions.

¶20. Sims next argues there was insufficient evidence to support his convictions. We apply a de novo standard of review to challenges to the sufficiency of the evidence. *Sanford v. State*, 247 So. 3d 1242, 1244 (¶10) (Miss. 2018). In doing so, "we view the evidence in the light most favorable to the State and decide if [a] rational [finder of fact] could have found the State proved each element of the crime." *Lenoir v. State*, 222 So. 3d 273, 279 (¶25) (Miss. 2017). The issue is not "whether we think the State proved the elements. Rather, we must decide whether a reasonable [finder of fact] could rationally say that the State did." *Poole v. State*, 46 So. 3d 290, 293-94 (¶20) (Miss. 2010).

¶21. Sims is guilty of disorderly conduct under section 97-35-7(1)(i) if the City proved that, with intent to breach the peace, he "fail[ed] or refuse[d] to promptly comply with or obey a request, command, or order of a law enforcement officer, having the authority to then and there arrest any person for a violation of the law. . . ." Miss. Code Ann. § 97-35-7(1)(i). Both Officer Joiner and Officer Croy testified they repeatedly asked Sims to remove his hands from his pockets, and he refused each time. They also testified that Sims was "irate" and cursing at them with people in the surrounding area. Both this Court and the Mississippi Supreme Court have held these types of actions sufficient to prove disorderly conduct. *See Sendelweck*, 101 So. 3d at 741 (¶27) (holding that there was sufficient evidence of disorderly

10

conduct based on the "actions, behavior, and offensive language" of the defendant); *S.M.K.S. v. Youth Court of Union Cnty.*, 155 So. 3d 747, 750 (¶12) (Miss. 2015) (holding the officer lawfully arrested defendant for disorderly conduct when he failed to "obey [the officer's] commands to show his hands or to place his hands on the car under circumstances that could lead to a breach of the peace.").

¶22. Sims is guilty of resisting arrest under section 97-9-73 if the City proved that Sims resisted or obstructed by force, threats, violence, or any other means, an officer's attempt at a lawful arrest. Miss. Code Ann. § 97-9-73. The evidence discussed above shows that Sims' arrest was lawful. The evidence also shows that Sims refused to place his hands behind his back and that the officers had to physically move his hands in order to handcuff him. Additionally, Officer Joiner testified that there was a "brief struggle" before Sims was placed in the patrol vehicle.

¶23. Chief Judge Barnes's dissent claims that Officer Joiner did not have "reasonable suspicion to stop Sims, much less probable cause to arrest him." The United States Supreme Court provides a framework for determining whether reasonable suspicion exists at the time of a stop:

> When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the **"totality of the circumstances"** of each case to see whether the detaining officer has a **"particularized and objective basis"** for **suspecting legal wrongdoing**. This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person."

*United States v. Arvizu*, 534 U.S. 266, 273 (2002) (emphasis added) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). Essentially, the Supreme Court held that a review of reasonable suspicion should be based on the totality of the circumstances. Further, an officer's "'particularized and objective basis' for suspecting legal wrongdoing [and his] own experience allows [him] to make inferences from and deductions about the cumulative information available to [him]." *Id*.

¶24. The Mississippi Supreme Court has held that "[t]o stop and temporarily detain is not an arrest, and the cases hold that given reasonable circumstances an officer may stop and detain a person to resolve an ambiguous situation without having sufficient knowledge to justify an arrest." *Gonzales v. State*, 963 So. 2d 1138, 1141 (¶13) (Miss. 2007) (quoting *Singletary v. State*, 318 So. 2d 873, 876 (Miss. 1975)). In his bench ruling, the county court judge stated that the events surrounding the incident "would most appropriately be described as an ambiguous situation." We agree. Officer Joiner was called to the crime scene where one person was under arrest for shoplifting, and the security guard indicated there "may" be a possible male suspect in the area. Chief Judge Barnes' dissent admits that the officer observed Sims exit another business, walk toward the SuperLo (the location of the crime), then change direction. The officer testified that Sims appeared "highly suspicious" and that he kept "glancing" back at the patrol car. At this point in time, the officer, who is at the scene of a crime where one person is under arrest and is advised that there may be other individuals involved in the crime, observes Sims change directions from the patrol car and

12

continue to glance back at the patrol car in a suggestive manner. Based on the totality of the circumstances, the officer had reasonable suspicion to stop Sims and question him concerning his potential involvement in the crime being investigated.

¶25. The dissents claim that it was not an "ambiguous" situation despite two officers on scene being told that another male "may" be involved. However, upon arrival, Officer Joiner was engaging in an investigation in looking for a possible "male" suspect. Sims was a male. Sims had an outstanding warrant for his arrest for contempt of court. Sims certainly had a reason to avoid the officers, which corroborates the officer's testimony that Sims was acting suspiciously. The dissents have the luxury of now knowing that Sims was not involved in the crime being investigated. The officers did not have that luxury. They were conducting an investigation as to whether one or two people were involved in a crime for which they were called to a scene to investigate.

¶26. Further, Judge Westbrooks' dissent maintains that Officer Joiner had no reasonable suspicion to stop Sims, adding that Officer Joiner "exhibited implicit bias that led him to target Sims because he was Black." This conclusion makes factual determinations not made by the three previewing courts that found Sims guilty of disorderly conduct and resisting arrest. Pursuant to United States Supreme Court precedent, this Court must view what Officer Joiner knew at the time and not from 20/20 hindsight. *See Arvizu*, 534 U.S. at 273. As previously stated, both Officer Joiner and Officer Croy testified that upon arrival, they were told there was a possible male suspect in the area who may have been involved in the

crime for which one suspect was already in custody. Officer Joiner testified that he "might" have asked if the suspect was black or white in an attempt to obtain a description of the suspect. Officer Croy similarly testified that he "believe[d] [Officer Joiner] did ask on the radio to one of the other officers on scene if it was a black male or white male." No racial description was provided at that time. Officer Joiner continued to patrol the area and eventually stopped in front of the SuperLo parking lot to observe the storefront. At that point, he saw Sims exiting Tiger Hot Wings, which is located approximately fifty to one hundred yards to the left of the SuperLo. According to Officer Joiner, Sims was acting "unnatural" and "suspicious" when he "abruptly" changed direction after seeing the officers and continued to "look back" while walking away. Again, he was told upon arrival that a male suspect may be involved. Under the totality of the circumstances, Officer Joiner had reasonable suspicion to stop and question Sims.

¶27. Even though Officer Joiner had reasonable suspicion to stop and question Sims, Sims had every right to refuse to answer the officer's questions under the Fifth Amendment of the United States Constitution. Sims did not avail himself of that right. What Sims did **not** have a right to do is to conduct himself in a disorderly manner in violation of section 97-35-7(1)(i). As discussed above, both officers testified that Sims **repeatedly** refused to remove his hands from his pockets, was "irate," and continued to curse at the officers in a public place with people nearby. Both *Sendelweck and S.M.K.S.* have held that kind of behavior qualifies as disorderly conduct within the meaning of the statute. Thus, Sims's arrest was lawful.

14

Reviewing the evidence in the light most favorable to the City, a reasonable finder of fact could have found that the City proved each element to convict Sims of disorderly conduct and resisting arrest. Accordingly, we find that the evidence was sufficient to support Sims's convictions.

### 4. The verdicts were not against the overwhelming weight of the evidence.

¶28. Sims finally asserts that the trial judge's judgment was against the overwhelming weight of the evidence. Our role as an appellate court is to "view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017). "It is enough to say that the [trial judge sitting without a jury], and not the reviewing court, judges the credibility of the witnesses as well as the weight and worth of their conflicting testimony." *Walker v. State*, 791 So. 2d 885, 887 (¶2) (Miss. Ct. App. 2001) (quoting *Burrell v. State*, 613 So. 2d 1186, 1192 (Miss. 1993)).

¶29. As previously discussed, the City presented ample evidence to show that Sims was guilty of both disorderly conduct and resisting arrest. Further, the trial judge, sitting as the finder of fact, judged the credibility of the witnesses and weighed the conflicting testimony. In viewing the evidence in the light most favorable to the verdicts, it cannot be said that allowing the guilty verdicts to stand would sanction an unconscionable injustice.

### CONCLUSION

15

¶30. We find that Sims failed to show that the City committed a *Brady* violation. We also find that Sims failed to prove the City presented perjured testimony. Further, we find that the City presented sufficient evidence to support Sims's convictions and that the verdicts were not against the overwhelming weight of the evidence. Accordingly, we affirm Sims's convictions and sentences.

¶31. **AFFIRMED.**

> **CARLTON AND WILSON, P.JJ., GREENLEE, SMITH AND EMFINGER, JJ., CONCUR. BARNES, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS, McDONALD AND McCARTY, JJ. WESTBROOKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, C.J., McDONALD AND McCARTY, JJ.**

> **BARNES, C.J., DISSENTING:**

¶32. I respectfully dissent from the majority's determination that there was sufficient evidence to support Sims's convictions for disorderly conduct and resisting arrest. As the majority notes, for the charge of disorderly conduct, the State had to prove that Sims "failed or refused to promptly comply with or obey a request, command, or order of a law enforcement officer, *having the authority to then and there arrest any person for a violation of the law*." (Emphasis added). Furthermore, "[t]he offense of resisting arrest presupposes a lawful arrest." *Chambers v. State*, 973 So. 2d 266, 271 (¶13) (Miss. Ct. App. 2007) (quoting *Brendle v. City of Houston*, 759 So. 2d 1274, 1284 (¶33) (Miss. Ct. App. 2000)). In this case, the officer did not observe Sims committing any crime; nor do I find that the officer had reasonable suspicion to stop Sims, much less probable cause to arrest him.

Accordingly, I find the State failed to prove that the arrest was "lawful," and Sims cannot be guilty of disorderly conduct or resisting arrest.

¶33. If a police officer has "reasonable suspicion, grounded in specific and articulable facts" that a "suspect is wanted in connection with criminal behavior," the officer may detain the person for a brief investigatory stop. *Eaddy v. State*, 63 So. 3d 1209, 1213 (¶14) (Miss. 2011). "Grounds for reasonable suspicion to make an investigatory stop generally come from two sources: either the officers' 'personal observation' or an informant's tip." *Id*. at (¶15) (citing *Williamson v. State*, 876 So. 2d 353, 355 (¶11) (Miss. 2004)). Here, there was no tip that Sims was the person involved in the shoplifting that the officers were investigating.

¶34. With all respect to majority, a finding that Officer Joiner had "reasonable suspicion" to detain Sims because he "appeared 'highly suspicious'" is simply a conclusion not "grounded in specific and articulable facts." The only articulable fact was that Sims was "glancing" at Officer Joiner's patrol car. Officer Joiner's testimony was only that Sims exited Tiger Hot Wings, took a few steps toward the SuperLo, and then changed direction, walking past the patrol car and across the parking lot. Officer Joiner acknowledged, however, on cross-examination that he had no verifiable evidence that Sims had committed any crime at the time of his arrest; he had arrested Sims prior to knowing the outstanding warrant for contempt of court:

Q. And you said that once he had been arrested for resisting arrest and disorderly conduct you learned that he had a warrant outstanding.

A. Correct.

17

Q.    At the time you first stopped Mr. Sims, you did -- he had not committed a crime in your presence, had he?

A.    Not to my knowledge.   It was suspected that there was possibly criminal activity, but . . .

Q.    I understand suspected.  I'm asking had he committed one in your presence.

A.    Not in my presence, no.

 . . . .

Q    Okay.  And I just want to be clear that at the point that you found out about the warrant[,] you had already arrested him for disorderly conduct or resisting arrest, hadn't you?

A.    Correct, based on his actions.

 . . . .

A.    . . . I had already put him in handcuffs and ran his information, and they advised that he did have a warrant for his arrest.

Moving for a directed verdict, defense counsel argued that Officer Joiner "had no reasonable suspicion that Mr. Sims had committed any crime when he made his initial stop of him," and "[t]here was no breach of peace threatened, no circumstances around that."  I find there was insufficient evidence presented that Officer Joiner had "reasonable suspicion, grounded in specific and articulable facts" to detain Sims.

¶35.   I further find that the situation surrounding Sims's detention was not so "ambiguous" as to warrant the investigatory stop.  As the majority notes, even when attempting to resolve an "ambiguous situation," the circumstances surrounding the detention must still be

18

"reasonable." *See Gonzalez v. State*, 963 So. 2d 1138, 1141-42 (¶13) (Miss. 2007). The majority admits that the security guard at the store merely identified a possible "second individual." Although Officer Joiner averred that "[t]hey gave a description, yeah, as a male, that she arrived to the store with a male," none of the other officers who testified could recall any defining characteristics of this possible second suspect, including Detective Crum, who interviewed the security guard. Further, Detective Crum testified that there were several other businesses near the store, some of which were open that evening, including "a very busy gas station that's directly across from it, within the same parking lot . . . , a Regions Bank in the parking lot and some food businesses, McAlister's, [and] a nail salon." However, Officer Joiner elected to single out Sims, who was leaving work and who, I think reasonably, elected not to involve himself in an active crime scene by avoiding the SuperLo. To reiterate, I find that there were no "specific and articulable facts" warranting Sims's investigatory stop in this instance.

¶36.    The majority also asserts that Sims "did not have a right to . . . conduct himself in a disorderly manner[,]" noting his "irate" behavior, profanity toward the officers, and refusal to "remove his hands from his pockets." In *Jones v. State*, 798 So. 2d 1241, 1247 (¶12) (Miss. 2001), the Mississippi Supreme Court recognized that law enforcement has "no right to arrest [a] defendant unless it was evident to [the officer] at the time that some breach of the peace was being threatened or a crime was being committed in his presence." (Quoting *Terry v. State*, 252 Miss. 479, 173 So. 2d 889, 891 (1965)). "A person has a fundamental

19

right to use reasonable force to resist an unlawful arrest." *Id*. at 1254 (¶39); *see also Johnson v. State*, 754 So. 2d 576, 578 (¶13) (Miss. Ct. App. 2000) ("[A] person may resist his own unlawful arrest.").

¶37. In this instance, any disorderly conduct or "breach of peace" stemmed from Sims's unlawful detention. Officer Joiner testified that it was not until he turned on his blue lights that Sims engaged with the officer, uttering profanity and accusing the officer of harassing him because he was black. Worried because Sims had his hands in his pockets and was walking toward him "in an aggressive manner," the officer admitted that "maybe" he cursed at Sims, explaining that when someone is being aggressive, "I'm probably going to say, [g]et your F'g hands out of your pocket, just to -- that's a common practice. I know it may be unprofessional, but at the same time, sometimes people don't understand. That's the only language that they do understand." Officer Joiner also could not remember if Sims voluntarily put his hands on the hood of the patrol car or if the officer had to do it. Officer Joiner said it was when he patted Sims down that he decided to "detain" him "to confirm or dispel the suspicions that [he] had regarding the shoplifting"; so he asked Sims to put his hands behind his back. Sims refused, telling the officer, "No. F**k you." It was at that point officers physically restrained Sims, while Sims attempted to pull away from them. As noted, Officer Joiner was not aware of the outstanding warrant until after Sims was taken into custody.

¶38. I acknowledge that the supreme court determined in *S.M.K.S. v. Youth Court of Union*

20

*County*, 155 So. 3d 747, 750 (¶12) (Miss. 2015), that a person's refusal to comply promptly with an officer's command "constituted a circumstance 'which may cause or occasion a breach of the peace[.]'" The totality of the circumstances in *S.M.K.S.*, however, was more egregious than here, as that suspect was in close proximity to a vehicle involved in a "shots fired" situation; so police were concerned he may have been armed.[6] *See id.* at (¶11). The only information available to Officer Joiner, according to his testimony, was that the female shoplifter "arrived to the store with a male"; he acknowledged that there was no other identifying characteristics of the potential suspect. And, as already noted, no other witness could recall if the second individual had been identified as a male. Sims simply had the unfortunate timing to be leaving his place of work at the precise time police were investigating a nearby shoplifting. It was ultimately determined that Sims had no connection to the shoplifting. The officer had no lawful reason to ask Sims to put his hands behind his back—ostensibly to be handcuffed.

¶39. This Court addressed similar circumstances in *Harrell v. State*, 109 So. 3d 604, 605 (¶1) (Miss. Ct. App. 2013), where the defendant was charged with disorderly conduct and failing to obey law-enforcement commands after becoming "irate" and refusing to comply

---

[6] I also find the other case cited by the majority, *Sendelweck v. State*, 101 So. 3d 734, 740 (¶25) (Miss. Ct. App. 2012), distinguishable, as the defendant in that case initiated the contact with law enforcement. When officers arrived at the scene, *summoned by Sendelweck*, the defendant "walked across the street and irately pointed his finger in [the officer's] face, refused the officer's request to calm down, instead continuing "to yell and curse." *Id*. Here, it was the officer who initiated contact, flashed his blue lights, and "maybe" cursed Sims when he protested what he alleged to be harassment.

21

with the officer's instructions. We concluded that because the officer lacked "the requisite reasonable suspicion that Harrell was engaged or had engaged in criminal conduct, [his] statements and actions after the unlawful stop are fruit of the poisonous tree and are, therefore, inadmissible." *Id*. at 607 (¶11). Likewise, I find Sims's conduct *after being detained* could not be used to support his detention and arrest. *See also Mastin v. State*, 180 So. 3d 732, 738 (¶18) (Miss. Ct. App. 2015) (finding that "[b]ecause the evidence was insufficient to establish the legality of [the defendant's] arrest, it was also insufficient to establish that he resisted a lawful arrest").

¶40. Here, Officer Joiner's suspicion was not reasonable and was ultimately disproved. Because the State failed to prove that Sims's arrest was lawful, his motion for a directed verdict should have been granted by the trial court, and I would vacate Sims's convictions for disorderly conduct and resisting arrest.

**WESTBROOKS, McDONALD, AND McCARTY, JJ., JOIN THIS OPINION.**

**WESTBROOKS, J., DISSENTING:**

¶41. I, too, respectfully dissent from the majority's determination that there was sufficient evidence to support Sims's convictions for disorderly conduct and resisting arrest. I join and wholeheartedly agree with Chief Judge Barnes's dissent. I especially agree that Joiner had no characteristics identifying him as the potential second suspect, as no description of the second suspect was ever given, and would also point out that there was only a "possible" second suspect as stated by the police—there was no corroborating testimony from the

22

security guard or anyone present at the SuperLo regarding a second suspect. I write separately to emphasize that Officer Joiner lacked reasonable suspicion and based on his own testimony and the evidence, he exhibited implicit bias that led him to target Sims because he was Black.

¶42. On January 7, 2016, in Southaven, Detective Tara Crum responded to a report of shoplifting at the SuperLo Foods store at approximately 8:44 p.m. At the time, the security guard detained a white female suspect, and it was *believed* that there had been another individual involved. The white female was apprehended while caught in the act. It was *believed* the other potential person exited the store prior to her getting caught. There was no ascertainable information given regarding the potential second suspect—no gender, no race, no ethnicity, no handicaps, no clothing—nothing.[7] Detective Crum admitted that she did not recall relaying the description of the second person over the radio. Detective Crum also testified there was nothing in her report describing the second suspect.

¶43. On this chilly winter evening, Sims, a surgical assistant, left his second job at his family's business, Tiger Hot Wings, after cooking for over eight hours. Tiger Hot Wings sat in the same parking lot as the SuperLo and a gym. There was also a Regions Bank, a McAlister's Deli, and other commercial businesses in the vicinity. Sims testified that police officers came into the restaurant and that he served them all the time. He believed he had no

---

[7] Also there is nothing in the record that confirmed the "other person" existed or even that the shoplifting was undertaken by two people.

reason to be afraid of (or avoid) them. Sims also stated that the police often parked in the parking lot near the SuperLo.

¶44. Sims had ridden to work with his stepfather, Dennis Craddock, the owner of the family operation. They planned to leave work together. Dennis waited on the last customer to pick up an order. In the meantime, unaware of the shoplifting incident at the SuperLo, Sims walked out to go to the Citgo gas station to get some orange juice and male enhancement pills. It was chilly outside but just warm enough for Sims to wear only a thermal shirt. With no coat on, he kept his hands in his pockets. He could have gone to the SuperLo or a Kwik Mart for orange juice, but only Citgo had what he was looking for. As Sims was leaving Tiger Hot Wings, he noticed that there were people walking toward their cars from the surrounding businesses. He also noticed a police car, glanced at it, and kept walking straight toward the Regions Bank parking lot heading toward Citgo.

¶45. When Sims left Tiger Hot Wings, Officer Joiner was sitting in the parking lot observing the storefront of the SuperLo. Officer Joiner testified that there were several people walking in and out. Sims made a left-hand turn out of the store, then took four to five steps in the direction of the officers who were near the suspect vehicle. At that point Officer Joiner observed Sims stop abruptly the moment he saw the officers and change direction. Officer Joiner found this to be unnatural because people often approached officers to see what had happened or asked if it was ok to enter a store amid an investigation. Officer Joiner locked in on Sims and pursued him. Also notable are Officer Joiner's testimony and

24

submitted documents where he used the term "Black male" to describe the potential suspect.

¶46. As mentioned earlier, Detective Crum provided no ascertainable description or detailed characteristics of the second suspect, and there was no confirmation from anyone present at the SuperLo that a second suspect was present.[8] She did not identify the second suspect as being "male" or "Black." Detective Crum further confirmed that her investigation ended at 9:02 p.m. A memo from Officer Croy stated that he did not arrive to assist Officer Joiner until 9:00 p.m. and Office Joiner stated that Sims was detained at 9:02 p.m. The scope of the officers' investigation into Sims is reasonably suspect as Sims had not been implicated in the shoplifting, the investigation lasted only two minutes, and Sims was detained at the exact moment that the lead detective, Crum, said the investigation ended. It is also suspect that in his detailed narrative contained in the incident report dated January 8, Officer Joiner used the term "Black male" ten times. Officer Joiner's memo submitted on January 29, used the description eight times in referencing Sims. Officer Joiner's bias is also evidenced by the fact that he admitted that Sims was detained and in handcuffs for resisting arrest and disorderly conduct before Officer Joiner learned of the outstanding warrant.

¶47. "Both the Fourth Amendment to the United States Constitution and Article III, Section 23 of the Mississippi Constitution protect an individual's right to be free from unreasonable searches and seizures." *Cole v. State*, 242 So. 3d 31, 38 (¶12) (Miss. 2018) (quoting *Eaddy v. State*, 63 So. 3d 1209, 1212-13 (¶12) (Miss. 2011)). "To determine whether the search and

---

[8] The security guard did not testify at trial.

seizure were unreasonable, the inquiry is two-fold: (1) *whether the officer's action was justified at its inception*, and (2) whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (emphasis added) (quoting *Gonzales v. State*, 963 So. 2d 1138, 1142 (¶14) (Miss. 2007)). Both the United States Supreme Court and the Mississippi Supreme Court have stated that "[p]olice officers may detain a person for a brief, investigatory stop consistent with the Fourth Amendment when the officers have 'reasonable suspicion, grounded in specific and articulable facts[,]' [which] allows the officers to conclude the suspect is wanted in connection with criminal behavior." *Eaddy*, 63 So. 3d at 1213 (¶14); *see also Terry v. Ohio*, 392 U.S. 1, 21 (1968). "The Mississippi Supreme Court also has divided '[p]olice activity in preventing crime, detecting violations, making identifications, and apprehending criminals' into three types of action: (1) voluntary conversations, (2) investigative stops and temporary detentions, and (3) arrests." *Harrell v. State*, 109 So. 3d 604, 606 (¶8) (Miss. Ct. App. 2013) (quoting *Singletary v. State*, 318 So. 2d 873, 876 (Miss. 1975)).

¶48. "To assess whether the [officer's] stop was justified at its inception . . . we must review which facts, including any rational inferences drawn therefrom, were known to the agents beforehand." *Cole*, 242 So. 3d at 39 (¶18) (citing *Terry v. Ohio*, 392 U.S. at 21). Joiner's stop of Sims was not justified at its inception. Reasonable suspicion cannot be "unparticularized" or founded on a "mere hunch." *United States v. Jaquez*, 421 F.3d 338, 341 (5th Cir. 2005). Officer Joiner lacked specific and articulable facts because there were

26

none to begin with. First, there was absolutely no pronouncement of a description of a second suspect from the security guard, Detective Crum, or dispatch. There is absolutely nothing in the record that supports either Officer Joiner or Officer Croy's statement that they were told there was a possible male suspect. The alleged second suspect goes from having no description or defining characteristics to being described as a Black male ten times in Joiner's investigative report. Second, there was no evidence that the alleged person participated or even knew that a shoplifting occurred or was afoot. There definitely was no information that Sims was aware of or participated in the criminal activity at the SuperLo. Next, this incident stemmed from the belief that the ghost suspect was in the parking lot. Officer Joiner testified that he observed Sims exit Tiger Hot Wings (not loitering in the parking lot). Fourth, Sims walked out, glanced, and went about his business. Even if he looked back, this without more attending facts is unremarkable and not enough to give the officer reasonable suspicion. *United States v. Moreno-Chaparro*, 180 F.3d 629, 632 (5th Cir. 1999) (holding "that a look of surprise is of little significance"). Simply walking off does not give rise to reasonable suspicion either. *But see Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000) (An "unprovoked flight" in a "headlong" manner in a high-crime area gave rise to reasonable suspicion.).

¶49. Reasonable suspicion must have existed at the time Officer Joiner approached Sims and ordered him to stop walking. *United States v. McKinney*, 980 F.3d 485, 490 (5th Cir. 2020). The fact that Sims was in an area near where a crime had occurred, "standing alone,

is not enough to support a reasonable, particularized suspicion that [Sims] [committed] a crime." *Wardlow*, 528 U.S. at 124. Sims was unaware of the shoplifting incident that occurred at the SuperLo. It is notable that Officer Joiner and Sims both stated that there were other people walking in the parking lot, but Officer Joiner did not believe these people to be suspicious.

¶50. There is a clear disconnect between Detective Crum's wholly, absolute lack of description of the alleged second suspect and Officer Joiner's determination that Sims, a Black male, fit the generic description. Officer Joiner's self-determined theory pertaining to the second suspect, which led him to detain Sims, had no basis in fact and did not rise to the level of reasonable suspicion. As there was no reasonable suspicion for Sims to have been detained in the first place, I agree with the dissent that the conduct giving rise to Sims's conviction for disorderly conduct and resisting arrest should have been suppressed.

¶51. The majority references *Gonzales v. State*, 963 So. 2d 1138 (Miss. 2007), for support. Maj. Op. ¶24. The facts in *Gonzales* are distinguishable from the facts in this case. Gonzales's stop stemmed from a traffic stop where the highway patrol officer believed there was no tag displayed on the vehicle. *Id*. at 1139 (¶3). Gonzales's car tag was not conspicuously visible as required by Mississippi Code Annotated section 27-19-323 (Rev. 2006). *Gonzales*, 963 So. 2d at 1143 (¶20). While engaging Gonzales in a conversation, the officer noticed that Gonzales not only appeared very nervous but also looked to the passenger as if to get an idea as to how to answer the officer's questions. *Id*. at 1139 (¶2). She (Officer

28

McMullin) also smelled marijuana. *Id*. Officer McMullin told Gonzales why she pulled him over, and he pointed out the temporary tag in the lower lefthand corner of the dark tinted rear window; however, that was after the smell of marijuana had given her reasonable suspicion. *Id*. at 1139-40 (¶¶2-3). Also notable is that Gonzales consented to a search of the vehicle, which resulted in the discovery of marijuana residue and loose marijuana. *Id*. at 1140 (¶4).

¶52.    The first edict annunciated in *Gonzales* is that "[t]he rule is simple. Unless the marijuana was discovered during a legal search, it may not be seized. If it was illegally seized, it may not be admitted into evidence." *Id*. at 1140 (¶9). Our Supreme Court relied on a United States Supreme Court's decision, stating:

> The principal components of a determination of reasonable suspicion or probable cause *will be the events which occurred leading up to the stop* or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause.

*Id*. at 1141 (¶10) (emphasis added) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).

¶53.    I do not contest the law as pronounced in *Singletary* and *Gonzales*, but it is clear that a condition precedent must exist in the equation when evaluating whether circumstances justify reasonable suspicion or probable cause. As mentioned earlier, there was no description or confirmation there was a second suspect. The events here are based on a single shoplifter and no certainty there was a second shoplifter, much less that they were male or a Black male. The circumstances here were not ambiguous. Detective Crum's

29

testimony was hearsay, albeit the defense failed to object. The respective testimonies of Officers Joiner and Croy referenced by the majority in paragraph twenty-six are speculative at best and do not render the circumstances unambiguous.

¶54. With all due respect to the majority opinion, the issues and facts relative to reasonable suspicion and probable cause are normally addressed by two tribunals (i.e., by a justice court or municipal court judge during a probable cause hearing when the charges are brought and secondly, by a circuit court judge who has to make a decision on the legality of the stop and/or seizure). There is nothing extraordinary about this matter being previewed by three courts as opposed to one or two. Our obligation as the appellate court is to review and find errors made in those tribunals and reverse when we find necessary—as we have done before. With regard to any luxury, James Sims was not afforded the luxury or the freedom to leave work to walk to a gas station and glance (or look) at a police car in front of his family's restaurant. Officer Joiner used his luxury and privilege to brand Sims with the uncorroborated description of a second suspect. He coupled that with the authority of his badge and used it to stop and arrest Sims prior to having any knowledge of a misdemeanor warrant.

¶55. From my perspective, today's opinion tacitly supports open season for a glance. For the foregoing reasons, I respectfully dissent from the majority's decision to affirm Sims's convictions.

**BARNES, C.J., McDONALD AND McCARTY, JJ., JOIN THIS OPINION.**

30